```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
EDDIE GUMBS, also known as
Edward A. Gumbs,

                Petitioner,           MEMORANDUM & ORDER
                                      05-CV-5667(JS)
        -against-

WILLIAM D. BROWN, Superintendent
Eastern Correctional Facility,

                Respondent.
----------------------------------X
APPEARANCES:
Petitioner:        Eddie Gumbs, Pro Se
                   01-A-3147
                   Woodbourne Correctional Facility
                   99 Prison Road
                   P.O. Box 1000
                   Woodbourne, NY 12788

For Respondent:    Michael Herman Blakey, Esq.
                   Thomas J. Spota, Esq.
                   Criminal Court Building
                   200 Center Drive
                   Riverhead, NY 11901
```

SEYBERT, District Judge:

Petitioner, Eddie Gumbs ("Gumbs" or "Petitioner"), petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons below, the Petition is DENIED.

BACKGROUND

I. Factual Background

On April 2, 2000, Ethel Bridget Feldman ("Feldman"), a 36-year-old nurse, was driving home from some friends and decided to stop at the Shinnecock Smoke Shop on the Southampton Indian Reservation to purchase cigarettes for her mother-in-law. (Tr. 482, 483, 484, 490, 494.) As she returned to her car, she was

confronted by an African American male, about 5' 10" tall, with a raspy voice. He was wearing a red ski mask, which came down to his shoulders, a camouflage jacket, and blue jeans. As he approached, the man pinned Feldman to her car, told her that he had a knife, and demanded her money. (Id. at 485, 486-87, 503-05, 508.) Feldman did not see the knife. (Id. at 508.) Feldman screamed, attracting the attention of Christine Cuffee ("Cuffee"), the young woman who waited on her at the smoke shop. Cuffee later testified that she witnessed the end of the encounter with a man wearing green army fatigue pants. (Id. at 486, 487, 525-26, 529, 538.) The man pulled from Feldman's hand a wallet containing about seven dollars and some credit cards, and fled on foot. (Id. at 488-89, 530.) A short time after the robbery, Martha Arch ("Arch") noticed a blue minivan on a common driveway that she shared with her daughter, Melissa Walton ("Walton"), and called her daughter to inquire whether she had some friends over at her house. (Id. at 623-24, 716-17.) Walton said that she did not, but would go outside and look. (Id. at 624, 712.) She was met by her fiancé, Michael Knight ("Knight") (Id. at 558-560, 627, 722.) The van had decals hanging from the rear view mirror that indicated it belonged to a member of the Shinnecock Reservation. (Id. at 560, 627, 723.) Walton opened the van and found some papers listing the names of Petitioner's girlfriend and daughter. (Id. at 560, 720-21.) Arch, Walton, and Knight then discussed what to do with the van that they

2

believed had been abandoned on the property. (Id. at 728-29.) They decided to push it back toward the main road. Suddenly, Arch, Walton, and Knight heard some rustling from the end of a brush area and saw a man wearing an orange-reddish mask, carrying a kitchen type knife in one hand, wearing gloves, and carrying a leather bag or pouch in his other hand. (Id. at 564, 569, 570, 627-28, 629, 650, 729-30, 32.) Walton, unsure of who the man was, but guessing based on the papers that it was Petitioner, yelled "Eddie." The man then stopped moving, turned around, and said "What?" (Id. at 630, 732.) At trial, Walton relayed the rest of the exchange as follows:

> Q. And did you say anything more to him at that point?
> A. Yeah, I asked what was going on, what was happening.
> Q. And what, if anything did he say to you at that point?
> A. He just shook his head and said, Nothing, nothing's happening, nothing, I got to go.
> Q. And did you say anything more at that point?
> A. Yes. He was walking towards the minivan, opened the driver's side door and was getting ready to climb up in there. And I said, I don't understand what's going on, what's happening. He was climbing into the minivan. He pulled off his mask and took the gloves and the knife and the leather pouch that he was holding and threw them into the passenger seat. And I said, Eddie, is someone hurt, is something happening? I don't understand. Do I need to call an ambulance. I kept asking him do I need to call an ambulance, is anyone hurt.

3

. . . .

> And I asked him, you know, was there anything that I could do. And he said, no. He had to go. I have to go, I have to go.

Q. Now, at this point, the mask is off?
A. Yes. We're having the conversation through the driver's door window.

. . . .

Q. And the person you were having this conversation with, now you can see his face?
A. Yes.
Q. And who is the person you are having the conversation with?
A. Eddie Gumbs.

. . . .

Q. Can you describe the physical condition of Eddie Gumbs, his emotional --
A. He was sweating. He was out of breath. . . . . and he was very nervous and out of breath and saying that he had to go, he had to go.

. . . .

Q. Now, did there come a time . . . when the defendant actually leaves?

. . . .

A. Yes. He started the vehicle and backed the vehicle up into the part of our driveway which goes towards Montauk Highway. And as he backed out I followed the car out.

. . . .

Q. What, if anything, were you saying to him?
A. I was asking him, you know where he was

4

>       going, Are you all right?  And he said,
>       Yes, I got to go.  And he said to me, If
>       anyone asks you, you never saw me today.

(Id. at 732-37, 44.)

Walton then returned home and called the police. (745, 746.) Shortly thereafter, Trooper Patrick J. Liberti ("Liberti") of the New York State Police responded to a call regarding a robbery at the Shinnecock Reservation. Liberti was directed to try to locate a blue minivan (Id. at 664-65, 692.)

At approximately 1:45 p.m., Liberti located a minivan parked at the Shinnecock Outpost, another local store. Liberti and another trooper determined that the minivan was owned by Petitioner's brother, (id. at 667-68, 694, 865-66), and registered to Petitioner's mother, Harriet Gumbs, who resided at the Shinnecock Reservation. (Id. at 673, 695.) Liberti conducted surveillance of the area for nearly two hours, and at approximately 3:50 p.m., he observed an individual walk up to the driver's side of the minivan. (Id. at 677, 699-700.) Liberti drove down Old Soldiers Road to make a radio transmission, then entered the outpost and observed that the minivan had been moved (Id. at 679, 681). The same individual who had approached the minivan previously, left it and entered the side door of the Shinnecock Outpost at approximately 4:00 P.M. (Id. at 683.) Liberti, along with other officers who arrived on the scene, then made contact with Petitioner.

5

When approaching Petitioner, neither Liberti nor the other officers on the scene attempted to question him. Instead, they merely asked Petitioner who he was and informed him that they "ha[d] to talk to [him] about something." The officers stated that Petitioner, without prompting, responded "I was at home with my kids between 6 and 10:30. You got the wrong man. I was with my mother at the time. Becky said you all were looking for Ronnie. He was living with Rachel. He robbed Johnny's Smoke Shop. I got witnesses just like you." At approximately 4:15 p.m. Liberti placed the individual, which was the Petitioner, under arrest. (Id. at 686, 702-03.) Liberti testified that Petitioner was wearing a long sweater, but he was unaware of the type of pants Petitioner was wearing. (Id. at 701.) The police never found the gloves or mask worn by the robber, nor did he find Feldman's wallet or the knife the assailant used during the crime. (Id. at 703-04.) Petitioner was wearing different clothing at the time of his arrest than when he was seen by Arch, Knight, and Walton on their property.

II. Procedural History

On May 11, 2000, two lineups were held at the New York State Police Barracks in Islip Terrace, New York. Defense counsel was present at both lineups. Two witnesses, Knight and Arch, participated in each of the lineups. On both occasions, both Knight and Arch identified Petitioner as the individual they had

6

seen on their property on April 2, 2000. Defendant provided no evidence that either lineup was unfair, and defense counsel conceded that both lineups were fair at the Wade hearing.

Subsequently, Petitioner was tried in County Court, Suffolk County before Judge John N. Mullin for Robbery in the First Degree. On May 18, 2001, he was convicted of Robbery in the First Degree and sentenced to 15 years imprisonment. On December 30, 2003, Petitioner filed his appeal, raising five issues: (1) insufficiency of the evidence, (2) improper alibi witness jury instruction, (3) unbalanced marshalling of evidence, (4) use of hearsay to bolster prosecution witness, and (5) an unfair summation argument. On July 1, 2004, the Supreme Court of New York, Appellate Division, Second Department, affirmed the conviction and held, inter alia, that the claim of insufficient evidence was unpreserved and without merit. New York v. Gumbs, 8 A.D.3d 677 (App. Div. 2004). The Honorable Susan Phillips Read denied leave to appeal to the Court of Appeals on September 16, 2004. People v. Gumbs, 3 N.Y.3d 706 (2004).

On or about February 14, 2008, Petitioner filed his motion to vacate the County Court's judgment. Petitioner raised three issues: (1) concerning the mental condition of an investigator who did not testify at trial; (2) concerning the FOIL discovery of a second property invoice receipt; and (3) trial counsel's allegedly inadequate investigation of certain potential

7

defense witnesses to pursue possible robbery suspects other than Petitioner. On June 6, 2008, the County Court of Suffolk County denied the motion to vacate. A motion for leave to appeal was filed in the Supreme Court of New York, Appellate Division, Second Department on or about July 7, 2008, and on September 24, 2008, Associate Justice John M. Leventhal denied leave to appeal.

Now that the state court proceedings have concluded, the Court considers the present habeas petition.

## DISCUSSION

### I. Federal Habeas Review of State Convictions

Petitioner filed this action after the April 24, 1996, effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, the AEDPA's provisions apply to his case. See Williams v. Taylor, 529 U.S. 362, 402, 120 S. Ct. 1479, 1518, 146 L. Ed. 2d 389 (2000). Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This deferential review is applied as long as the "federal claim has been 'adjudicated on the merits' by the state court." Cotto v.

Herbert, 331 F.3d 217, 231 (2d Cir. 2003). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (internal citations and quotations omitted).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially distinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent." Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry, 532 U.S. at 792 (quoting Williams, 529 U.S. at 407-08). Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in

9

its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." Williams, 529 U.S. at 411.

II. Petitioner's Claim that the Evidence was Legally Insufficient to Support the Conviction

"The Due Process Clause of the Fourteenth Amendment prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the Petitioner] is charged.'" Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 840 (2d Cir. 1997) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970)). The Petitioner is only "entitled to habeas corpus relief if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979). The evidence must be viewed "in the light most favorable to the prosecution." Id. at 319. When challenging the sufficiency of the evidence in a state criminal conviction, petitioner "bears a heavy burden." Einaugler, 109 F.3d at 840. Additionally, "the government receives the benefit of having all permissible inferences drawn in its favor." Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002) (citing United States v. Martinez, 54 F.3d 1040, 1042 (2d Cir. 1995)). Furthermore, the verdict can "be based entirely on circumstantial

evidence." Martinez, 54 F.3d at 1043.

Contrary to Petitioner's assertions, and despite the inability of the robbery victim to identify Petitioner as the masked man who pointed a knife at her and took her purse, Respondent presented considerable evidence at trial supporting Petitioner's guilt beyond a reasonable doubt. Specifically, the Respondent produced witnesses who knew the Petitioner and who had observed him only minutes after the robbery. Moreover, the witnesses observed Petitioner long enough for them to have a brief conversation. These same witnesses testified that the clothes Petitioner wore at the time of the conversation matched the description of the clothing worn by the robber. Finally, Petitioner was still holding the knife and the leather bag that he had stolen. Thus, Petitioner fails to meet the demanding standard for overturning the jury's verdict, and his claim for insufficiency of the evidence is without merit. Accordingly, he is not entitled to habeas relief on this ground.

III. Ineffective Assistance of Trial and Appellate Counsel Claim

To prevail on a claim of ineffective assistance of counsel, Petitioner "must show both that his counsel acted 'outside the wide range of professionally competent assistance,' and that the deficiencies is his counsel's performance were prejudicial to his defense." Jameson v. Coughlin, No. 93-CV-2525, 1994 WL 131185, at *2 (2d Cir. Apr. 13, 1994) (quoting Strickland v. Washington,

11

466 U.S. 668, 690, 691-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). In evaluating whether an attorney's representation has fallen "below an objective standard of reasonableness," Strickland, 466 U.S. at 688, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." Id. at 691 ("[A] heavy measure of deference [is accorded] to counsel's judgments.")

The second prong of the Strickland test requires that any deficiencies in counsel's performance be prejudicial to the defense. See Strickland, 466 U.S. at 692. While a finding of prejudice is not dependent upon a showing "that counsel's deficient conduct more likely than not altered the outcome in the case," id. at 693, the petitioner nevertheless must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Bunkley v. Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995).

It is well established that counsel need not raise every non-frivolous issue simply because a client suggests it "if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751, 103 S.

12

Ct. 3308, 77 L. Ed. 2d 987 (1982); see also Abdurrahman, 897 F.2d at 74. Further, there is a strong presumption that counsel used reasonable professional judgment and conducted himself accordingly. See Clark v. Stinson, 214 F.3d 315, 321 (2d Cir. 2000) (quoting Strickland, 466 U.S. at 689). But "appellate counsel's performance may be found constitutionally inadequate upon demonstration that significant and obvious issues were ignored while weaker arguments were pursued." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). The Second Circuit Court of Appeals has adopted the test for ineffective assistance of trial counsel for claims of ineffective appellate counsel. Mabee v. Phillips, No. 05-CV-4182, 2009 WL 3644077, at *5 (S.D.N.Y. Nov. 4, 2009) (citing Bunkley, 68 F.3d at 1521).

Petitioner states that his trial counsel was ineffective because he failed "to investigate and utilize a confession by another to petitioner's alleged crime." (Pet. ¶ 12.) Additionally, Petitioner claims ineffective assistance of his appellate counsel "whom was not conflict free since appellate counsel failed to notify petitioner he was under investigation and/or indictment, and said conflict may have lead appellate counsel to secure funds from petitioner's family due to the financial problems appellate counsel was in and prepare an inept appellate brief." (Id.)

In support of his claim of ineffective assistance of

13

trial counsel, Petitioner provides the Court with what is purported to be an affidavit, signed by a Leo P. Schmidlin ("Schmidlin"). In the document, Schmidlin holds himself out as a New York State Licensed Private Investigator, and states therein "[t]hat there exists a written confession from a convicted felon that is being subjected to forensic handwriting analysis at the present time. Should this confession be verified, it would cast grave doubt upon the conviction of the defendant in this case." (Pet., Ex. P.) The Court's search of the New York Department of State's website reveals, however, that no such person is registered as a private investigator in New York.

Beyond this document of dubious validity, Petitioner provides the Court with no other information about the existence of such a confession. Moreover, Petitioner provides the Court with no evidence regarding when this supposed confession came to light. Thus, even if the Court were to credit the representations in the Affidavit, and a written confession does exist, there is no evidence that Petitioner's trial counsel had notice of this confession and could have done further investigation. Such incomplete allegations cannot establish that Petitioner's trial counsel was ineffective.

In support of his claim of ineffective assistance of appellate counsel, Petitioner provides the Court with newspaper articles outlining criminal charges that were levied against his

14

attorney. In short, in or around August 2005, Petitioner's attorney, Perry S. Reich ("Reich"), was convicted of forging a magistrate judge's order and lying to government to cover it up. Petitioner, however, in no way connects Reich's wrongdoing to his own case. In other words, the Court has no evidence that Reich's actions in a separate case, albeit reprehensible, had any bearing on Petitioner's appeal.

The evidence of Petitioner's guilt was overwhelming, and Petitioner's unsupported allegations are insufficient to show his trial or appellate counsel's decisions could have made a difference in his conviction. Accordingly, the Court finds that, based on the record, Petitioner fails to meet his burden demonstrating that counsel's conduct deprived him of his constitutional right to effective counsel. Petitioner is not entitled to habeas relief on this ground.

IV. <u>Alleged Brady Violation</u>

It is well settled that <u>Brady v. Maryland</u> and its progeny obligates the prosecutor in certain circumstances to disclose to the defense material exculpatory and impeaching information. <u>United States v. Rodriguez</u>, 496 F.3d 221, 224-25 (2d Cir. 2007). In this case, Petitioner claims that "petitioner was denied due process pursuant to the federal constitution in light of the prosecutorial misconduct due to it's withholding of brady material since it failed to disclose a confession of another to the crime

15

petitioner was convicted of." (Pet. ¶ 12.) Beyond that statement, however, Petitioner offers the Court little information. In fact, there is no evidence that another individual has confessed to Petitioner's crimes, except for Petitioner's own statements and the aforementioned document supposedly submitted by Schmidlin. This alone is insufficient to demonstrate that (1) someone else really did confess or (2) that Respondent knew about the confession and failed to disclose the confession or its contents to Petitioner. Moreover, while Petitioner argues that other individuals believe he was not the robber, and made statements to that effect in the past, there is no evidence that Respondent did anything to prevent the disclosure of these individuals or their testimony. In fact, Petitioner's counsel knew about these individuals, but made the decision not to call them as witnesses at trial. Based on these circumstances, Petitioner has failed to establish a <u>Brady</u> violation. Accordingly, Petitioner is not entitled to habeas relief on this ground.

V. <u>Prosecutorial Misconduct and Erroneous Admission of Evidence</u>

A prosecutor's actions may constitute a denial of due process if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 182, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); <u>Floyd v. Meachum</u>, 907 F.2d 347, 353 (2d Cir. 1990). "In evaluating whether allegedly improper [actions] by the prosecutor

16

are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." United States v. LaMorte, 950 F.2d 80, 83 (2d Cir. 1991) (citing United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986), cert. denied, 479 U.S. 827 (1986)).  To determine the degree of prejudice to a petitioner, courts consider (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct.  United States v. Young, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); La Morte, 950 F.2d at 83; United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981).

Similarly, an erroneous admission of evidence will not constitute a due process violation unless the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."  Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (internal quotation marks omitted).  For the unfairly prejudicial evidence to amount to a denial of due process, it must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotation marks omitted); Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985) (evidence must be "crucial, critical, highly significant" (internal

17

quotation marks omitted)).

To support his claims of due process violations, Petitioner states that "the prosecution's use of hearsay to bolster Walton's testimony and comments in summation regarding the defense's failure to call certain witnesses or elicit certain testimony deprived defendant of a fair trial." (Pet. ¶ 12.) Though it is unclear to the Court exactly to what bolstering testimony Petitioner is referring, it appears that he may be referencing the testimony of Arch and Knight. The record shows that during their testimony, both Arch and Knight corroborated statements made by Walton shortly after Petitioner emerged from the woods onto their property, based on <u>their own observations</u>. Thus, even if the testimony could be considered hearsay, it was immaterial. Respondent presented ample other evidence of Petitioner's guilt, and even if the trial court prevented the "bolstering," the jury could have easily relied on the remaining evidence to find Petitioner guilty beyond a reasonable doubt.

As to Petitioner's claims that the Respondent's summation violated his due process rights, the Court's review of the record reveals nothing that was so severe so as to deny Petitioner a fair trial. Moreover, Petitioner points to no specific portion of the summation as the basis for his claims. Thus, as Respondent correctly points out, the summation, taken as a whole, was a fair comment on the evidence presented. Accordingly, Petitioner is not

entitled to habeas relief on this ground.

VI. <u>One-Sided Marshaling of the Evidence</u>

Generally, where a federal court reviews the conduct of a state trial judge on habeas review, the federal court "must find the trial court's conduct to be substantially significant and substantially adverse to the defendant before it holds that the trial judge's conduct created an appearance of partiality which exceeded constitutional limitations." <u>Jenkins v. Bara</u>, 663 F. Supp. 891, 898 (E.D.N.Y. 1987). "Federal review is limited to 'the narrow one of due process and not the broad exercise of supervisory power that we would possess in regard to our own trial court.'" <u>Bien v. Smith</u>, 546 F. Supp. 2d 26, 49 (E.D.N.Y. 2008) (<u>quoting</u> <u>Garcia v. Warden, Dannemora Correctional Facility</u>, 795 F.2d 5, 7-8 (2d Cir. 1986). Thus, "'[a] trial judge's intervention in the conduct of a criminal trial [must] . . . be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.'" <u>Id.</u> (<u>quoting</u> <u>Johnson v. Scully</u>, 727 F.2d 222, 226 (2d Cir. 1984)). Merely "undesirable" remarks by the judge will be insufficient to establish a constitutional violation. <u>Daye v. Attorney General</u>, 712 F.2d 1566, 1572 (2d Cir. 1983).

In <u>Johnson</u>, the Second Circuit found that the trial judge's conduct in questioning witnesses and focusing heavily on

19

the prosecution's case and evidence while instructing the jury did not raise a constitutional concern. Bien v. Smith, 546 F. Supp. 2d 26, 49 (citing Johnson, 727 F.2d 222). In contrast, based on the entirety of the charge, the trial judge in this case gave a fair discussion of the evidence presented at trial. In support of his argument, Petitioner focuses on the trial court's language regarding the failure of the alibi witnesses to come forward earlier as evidence of the court's "one sided marshaling of the evidence." (Pet. ¶ 12.). But any language used by the trial court in this case is a far cry from the trial court's conduct in Johnson. Thus, Petitioner fails to establish a constitutional violation based on the trial court's jury charge; he cannot show that the conduct was adverse to him in any substantial degree, and he is not entitled to habeas relief on this ground.

## CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. A Certificate of Appealability is DENIED. The Clerk of the Court is directed to mark this matter as CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: January  4 , 2010
       Central Islip, New York